# Green's Administrator et al. v. Smith.

(Decided May 23, 1930.)

C. C. ADAMS for appellants.

L. M. ACKMAN for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Affirming.

Lizzie Green married Owen Powell. He died in January, 1919, of influenza. They then had two children, one seven years old and another about a year old. She had three bachelor uncles, Daniel, Dudley and Norman Green, all advanced in age and living together in good circumstances. Mrs. Powell went to live with her uncles and remained with them until their death. They each made a will in 1921 by which he left his property to his brothers with power to use it as they pleased, but what was left at their death to be divided equally among their nephews and nieces. Daniel died in December, 1924; Dudley died on August 20, 1927; Norman died September 9, 1927. They were all three infirm old men when Mrs. Powell went to live with them. Two of them had rheumatism and the other suffered from kidney trouble. Norman was practically confined to his bed for a year and a half before he died. The others were sick but not confined to their beds so long before death. G. W. Bromback qualified as administrator with the will annexed of Norman Green, as he died last. In December, 1927, Lizzie Green Powell Smith, who had married R. W. Smith after the death of her uncles, made out her verified claim against the estate for her services, amounting to $1,776. The administrator refused to pay the claim, and on January 4, 1929, she brought this suit thereon against the executor and the other heirs at law, alleging in her petition the facts above stated, (and as she had shown in her verified claim) that in January, 1919, she was contracted with and hired by her three uncles to come to their home, assume general management of the home and care for them, all of them being old men then and in feeble health; that pursuant to their request and promise to pay her a reasonable compensation for her services, which contract and promise was then and there made by each of them, she moved into their home and thereafter performed the duties as housewife and of nursing and caring for each of them until they died. She also alleged that at divers times and throughout her period of services to them and until immediately prior to the death of each of them they promised they would pay her for her services rendered by her to them, but had paid no part of the sum, and that $1,776 was the reasonable value of her services rendered them by her. She prayed judgment for her claim, alleged that she was one

of the heirs of the estate, and also prayed that the estate be settled and for her costs and all proper relief. The administrator then had in his hands something over $8,000 in money, and there were some uncollected assets. The administrator and the heirs at law filed a joint answer denying the allegations of her petition as to her claim of $1,776 and pleading limitations as to all of it that was for services rendered more than five years before the bringing of the action. The court sustained a motion of the plaintiff for a jury trial on her claim. The trial was had before a jury, which returned a verdict in favor of the plaintiff for the amount she sued for. The court entered judgment on the verdict. The defendants appeal.

It is insisted for the appellants that on the merits of the case the judgment is unwarranted; that the jury should have been instructed peremptorily to find for the defendants; and that on all the evidence a new trial should be granted. As this is the most important question in the case, it will be first considered. In such cases where there is a close relationship between the parties the rule is that the contract relied on must be established by clear proof, and that no recovery may be had upon an implied contract. The cases in which the evidence has been held sufficient and those in which it has been held insufficient are collected in Kellum v. Browning, 231 Ky. 320, 321, 21 S. W. (2d) 459. The question presented therefore is: Does the plaintiff's proof clearly show an express contract? Of course, Mrs. Smith could not testify and she had to rely upon other witnesses. James P. Chipman, who was a near neighbor of the Greens, said that after her husband's death they said they were going to take her home and going to take care of her; that she came there and stayed there and waited on them during their sickness and they wanted her to have an equal share with the rest and have extra pay for waiting on them. He had heard all of them say this; that about a month before Dudley died he heard him say he wanted Lizzie well paid for taking care of him. A. E. Burgess, who was also a neighbor and often in the house, makes this statement:

"Well, Uncle Norm said that he only moved Lizzie up there to see after us all and if she would stay with us and not marry as long as we lived, we will pay her well for her services, for waiting on us sick people. That is what Uncle Norm said.

"Q. I will ask you to state if you ever heard Uncle Dan make statements to Mrs. Powell. A. Oh, yes. I heard him call her into the room, she came in, he said, 'Lizzie stay with us and I will pay you and pay you well for waiting on us.' She told him yes, she said, 'Uncle Dan, I won't leave you.'"

He also says on another occasion this occurred:

"Uncle Norm said 'Dudley we will have to collect in some checks or get them out and pay Lizzie and the little tots in order to pay her for waiting on us and staying with us.' Said, 'the Bill Osborn note, if we can get somebody to collect that, that will help pay.' Dudley said 'Well.'

"Q. How long was that before the death of the brothers, if you know, in your best judgment? A. Six or seven months, somewhere along there, as near as I can remember."

Sol Washum makes this statement:

"I went up there about that time, some time along there, in August or September, along that time. I believe that I had a note to pay off, a note that I had to Mr. Green; I asked him how he was feeling, he told me very bad, feeling very poorly. He said, 'This comes in a mighty good place.' He got Lizzie to get the notes; he wasn't able to get the notes, but to say whether or not she was in the room when he said these words I would not be positive about it.

"But anyhow he told me, he said 'this money comes in good place,' said 'we are getting pretty well behind, we had a good deal of sickness, I am going to have L. M. Ackman to go out and take care of some business, some notes that I have got out, they are slow about coming in.' Said 'I want him to see about this business, settle up our business, see that Lizzie is paid for taking care of us.'

"She went in and out, but I don't know whether she was in at the time he was talking to me or not."

J. T. Chipman makes this statement:

"Q. State what Norm said? A. 'I am going to take care of Lizzie, she has been better to me now than my mother ever was, has done more.'

"Q. What else did he say? (Defendants object and move to exclude the foregoing answer: motion overruled; exception.) A. Said, 'I want to collect up my money and turn it over to her so they won't be any trouble afterwards.'

"Q. What did he say? A. He said he allowed to collect his money and turn it over to her."

Cuthbert McComas testifies that he went there to borrow $500.00 and this occurred:

"But I got the hundred, he said he didn't have the other to spare, that Dan was sick, they were getting old, they didn't know when they would need their money to pay Lizzie."

It is also shown by the proof that the Osborn note was for something over $4,000, and it was not paid until after Norman died. These witnesses were practically uncontradicted, and their testimony is sufficient to show an express contract to pay for the services that the niece rendered. She went there with $1,500 in money and the old men declared more than once that she was paying out of her own money for the personal expenses of her children and herself. She served them faithfully. She did not marry as long as any of them lived and nursed them tenderly while sick. While it is true that Mrs. Sowder was there when she went there and was doing the cooking and washing and continued to do this, the weight of the evidence shows that appellee was the manager of the home and in charge of it. Mrs. Sowder was a woman without education and with little intelligence. She could not read or write, and the old men needed, in more ways than one, the help of their intelligent niece. The verdict of the jury is not against the weight of the evidence in fixing the amount of her claim. The controversy here is in the end between appellee and her cousins, who are the others heirs of the estate. She gets only one-eighth of the estate as an heir, and on the whole case the court is unwilling under the evidence to disturb the finding of the jury in her favor on her claim.

It is insisted for appellants that the plea of five years' limitation as to all services rendered more than five years before the action was brought was not replied to. But in her petition the plaintiff aptly alleged that the deceased had promised to pay her claim from time to time as long as they lived and this was only a short

time before the petition was filed. The allegation of the petition was denied. The answer made up the issues. It was unnecessary for the plaintiff to reply to the answer and reallege what she had already alleged in the petition and stood denied in the answer. The rule is well settled that where the plaintiff anticipates a plea of limitation in this way and an issue is made by the answer thereon, no reply to the plea of limitation is necssary. Klineline v. Head, 205 Ky. 647, 266 S. W. 370; Dowell v. Gray, etc., Milk Co., 221 Ky. 780, 299 S. W. 965; Harlan Gas Co. v. Hensley, 223 Ky. 221, 3 S. W. (2d) 640; Case v. Greer, 229 Ky. 823, 18 S. W. (2d) 288.

There was no substantial error in the admission or rejection of evidence. The instructions given by the court were asked by appellants and there was no objection or exception thereto.

Complaint is made that the case was heard prematurely. It is insisted that the warning order was insufficient as to the nonresidents and they were not before the court. But they had all filed answer. After the answer was filed putting in issue appellee's claim, she moved for a jury trial on it. The court sustained the motion and the defendants excepted. When the case came on for trial both parties announced ready and went into the trial without objection or exception. The court might properly sustain the plaintiff's motion for a jury trial after the answer was filed and before other steps were taken. This motion is one that is required by the rules of this court to be made promptly and if not made promptly will be deemed waived. There was therefore no error in this matter, and very clearly nobody's substantial rights were prejudiced by either of these rulings. The administrator was the only person who was really a necessary party in the determination of the validity of her claim. The other parties were only necessary for the settlement of the estate. When the case was called for trial they were all ready and went into the trial without objection. It is thrice provided in the Civil Code that a judgment shall not be reversed for an error not prejudicial to the substantial rights of the party complaining. Civil Code of Practice, secs. 134, 338, 756.

The other objections in the brief need not be noticed further, as they clearly were not prejudicial to the substantial rights of appellants.

Judgment affirmed.