In re CONSOLIDATED INDUSTRIES CORP., Debtor.

Enodis Corporation, Plaintiff,

v.

Wausau Insurance Company, et al., Defendants.

Bankruptcy No. 98–40533.
Adversary No. 00–4027.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Nov. 7, 2001.

J. Joseph Bainton, New York, NY, John Burns, Fort Wayne, IN, for Plaintiff (Enodis).

Gordon Gouveia, Merrillville, IN and Terri Brieske, Chicago, IL, for Trustee (Daniel L. Freeland).

## *DECISION*

ROBERT E. GRANT, Bankruptcy Judge.

By this adversary proceeding, the plaintiff, debtor's former parent, Enodis (formerly Welbilt) Corporation, seeks a declaratory judgment concerning its rights under a contract by which William Hall acquired all of the debtor's stock. In particular, Enodis asks the court to determine that it is entitled to cancel liability insurance it previously acquired for the debtor. The Trustee and Enodis have submitted that issue to the court for a decision upon an agreed statement of facts, and the briefs and arguments of counsel.[1]

Prior to January 6, 1998, the debtor was a wholly owned subsidiary of Welbilt and then Welbilt Holding Corporation. (Joint Pre–Trial Order ¶ 15(a), (b).) On that date, pursuant to a series of agreements executed by Welbilt, Welbilt Holding, William Hall and the debtor, Hall acquired all of the debtor's issued and outstanding stock. (Joint Pre–Trial Order ¶ 15(d).) As part of this agreement, Welbilt represented that it had maintained product liability insurance benefitting Consolidated for the ten year period prior to the sale and agreed that Consolidated would remain as an additional insured under those policies. (Joint Pre–Trial Order ¶ 15(f), Plaintiff's Statement of Genuine Issues ¶¶ 5, 7.) Welbilt also agreed to continue to procure and maintain product liability insurance to cover Consolidated for three years after the sale. (Joint Pre–Trial Order ¶ 15(g).) Since the insurance policies in question required Welbilt to pay a self-insured retention and to reimburse the insurance companies for various claims handling expenses when claims were made against Consolidated, Hall agreed that he would either pay these post-closing insurance costs or cause Consolidated to do so. (Joint Pre–Trial Order ¶ 15(h).) Consolidated guaranteed Hall's performance of this obligation. (Appendix of Exhibits, Exhibit A).

Prior to the petition Consolidated was named as a defendant in several class action lawsuits arising out of allegedly defective furnaces it had manufactured. This litigation has resulted in post-closing insurance costs which Enodis has had to pay and for which it is entitled to reimbursement. (Joint Pre–Trial Order ¶ 15(p), (s).) Since the date of the petition, May 28, 1998, neither Hall nor the debtor has reimbursed Enodis the amounts due it. (Joint Pre–Trial Order ¶ 15(v).) As of May 18, 1999, the unpaid post-closing insurance costs totaled $91,519.16. (Joint Pre–Trial Order ¶ 15(w).) Furthermore, Enodis will continue to incur additional costs and expenses for which it is entitled to reim-

---

1. The only remaining issue in this case is the dispute between Enodis and the Trustee. All other claims have been dismissed.

bursement. (Joint Pre–Trial Order ¶ 15(aa—dd).)

The insurance policies in question provide that Welbilt may cancel them, in whole or in part, by giving written notice to the carrier. (Joint Pre–Trial Order ¶ 16(d).) Given the unreimbursed post-closing insurance costs it has already paid and faced with the prospect that it will continue to incur additional costs which will not be reimbursed, Welbilt initiated this adversary seeking a declaration that it is excused from any further obligations under the agreement. In particular, it asks the court to declare that it may proceed to cancel the debtor's insurance coverage.

### DISCUSSION

Much of Plaintiff's initial argument is based upon the proposition that the agreement between it, Hall and the debtor constitutes an executory contract which was breached when the trustee failed to assume it within the sixty days following the conversion of this case to Chapter 7. *See,* 11 U.S.C. § 365(d)(1), (g). This has caused both parties to devote a great deal of attention to debating whether the agreement is or is not an executory contract. Yet, as this court has previously observed, the search for executoriness is often misplaced, *see, In re Udell,* 149 B.R. 898, 901–02 (Bankr.N.D.Ind.1992), and that observation is equally valid here. If the agreement does constitute an executory contract, it was rejected when the Trustee failed to assume it within the time required, 11 U.S.C. § 365(d)(1), and, therefore, has been breached. *See,* 11 U.S.C. § 365(g)("the rejection of an executory

contract ... constitutes a breach of such contract"). If, on the other hand, the agreement does not constitute an executory contract, it has been breached because Hall and the debtor have failed to reimburse Enodis the amounts due it. Either way, whether actually or only theoretically, the agreement has been breached. As a result, the court should focus its attention on the consequences of that breach and its effect on the rights of the parties, and not on whether the agreement is an executory contract.

■ The rights of the parties are initially determined by state law. *See, e.g., Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *In re FBN Food Servs., Inc.,* 82 F.3d 1387, 1396 (7th Cir.1996). *See also, In re C & S Grain Co., Inc.,* 47 F.3d 233, 237 (the extent of a party's obligations after another party repudiates its own is a matter of state law). Bankruptcy begins with these non-bankruptcy entitlements and then proceeds to adjust or modify them in order to accomplish the goals of the statute. As a result, the court must first consider what the rights of the parties would be under state law before it considers how those rights may have been changed by Consolidated's bankruptcy.

■ The court's job in construing the agreement is to "determine the intent of the parties at the time the contract was made." *First Fed. Sav. Bank v. Key Markets, Inc.,* 559 N.E.2d 600, 603 (Ind.1990). To do so, absent ambiguity, the court should examine the language employed within the "four corners of the instrument."[2] *Evans v. Med. & Prof'l Collec-*

---

2. Where more than one writing relates to the same transaction or subject matter and the writings are contemporaneous, the court may construe the writings together as a contract. *Estate of Spry v. Greg & Ken, Inc.,* 749 N.E.2d

1269, 1273–74 (Ind.App.2001); *Abbey Villas,* 716 N.E.2d at 100. Although the parties disagree as to whether the stock purchase agreement and the debtor's guarantee of Hall's obligation under that agreement represent a

*tion Servs., Inc.,* 741 N.E.2d 795, 797 (Ind. App.2001); *Abbey Villas Dev. Corp. v. Site Contractors, Inc.,* 716 N.E.2d 91, 99–100 (Ind.App.1999). The terms of the parties' agreement are clear and its goal is readily apparent. By it, Welbilt warranted that it had maintained product liability insurance for Consolidated's benefit for ten years prior to the sale, agreed that Consolidated would remain insured under those policies, and further agreed to procure and maintain product liability insurance for Consolidated's benefit for an additional three years. Hall, in turn, agreed to reimburse Welbilt for the sums it would be obligated to pay under those policies when claims were made against Consolidated, and Consolidated, the principal beneficiary of the insurance, guaranteed Hall's performance. The agreement involved the exchange of mutually dependent promises—in exchange for Welbilt's promise to maintain and procure insurance for Consolidated's benefit, Hall and Consolidated promised to reimburse Welbilt for the amounts that it would be obligated to pay as a result of the claims asserted against Consolidated. The intent of the parties to the agreement is illuminated by the context of the transaction, the sale of a business plagued with potential liability. Structured as it was, the agreement seems to represent a rational way of shifting the additional cost of debtor's insurance coverage from Welbilt to the parties who would benefit most from that coverage once ownership of Consolidated passed, namely to Hall and Consolidated.

█ When Hall and Consolidated subsequently failed to reimburse Welbilt for Consolidated's post-closing insurance expenses they breached their obligations under the agreement. This default deprived Welbilt of a substantial benefit of its bargain; it was, therefore, a material breach. *See, e.g., Tomahawk Village Apartments v. Farren,* 571 N.E.2d 1286, 1293 (Ind.App. 1991); *Goff v. Graham,* 159 Ind.App. 324, 306 N.E.2d 758, 765 (1974). It is an immutable principle of contract law that, in the face of a material breach of contract, the non-breaching party may suspend its performance, *see, e.g., Abbey Villas,* 716 N.E.2d 91, 101–02 (Ind.App.1999); *American Nat'l Bank & Trust Co., v. St. Joseph Valley Bank,* 180 Ind.App. 546, 391 N.E.2d 685, 687 (1979) and attempt to mitigate its damages. Indeed, the law imposes a duty on the non-breaching party to mitigate the damages it will sustain. *See, Sallee v. Mason,* 714 N.E.2d 757, 763 (Ind.App. 1999); *Sheppard v. Stanich,* 749 N.E.2d 609, 612 (Ind.App.2001). In this instance, the only way Enodis can do so is by attempting to cancel Consolidated's insurance coverage. Otherwise, its damages will continue to accrue unabated. *See, e.g., Nelson v. Marchand,* 691 N.E.2d 1264, 1271 (Ind.App.1998). Under these circumstances, Enodis was no longer required to perform its obligations under the agreement. *See, e.g., Sallee,* 714 N.E.2d at 762–63; *Tomahawk Village Apartments,* 571 N.E.2d at 1293(citing *Licocci v. Cardinal Assocs., Inc.,* 492 N.E.2d 48, 52 (Ind.App. 1986)).

Under Indiana law, Enodis' duty to continue to pay post-closing insurance expenses and to maintain the debtor's insur-

---

single agreement or two separate agreements, the court finds the argument irrelevant. Whether we are confronted by one agreement or two is of much less significance than the fact that the agreement has been breached. The issue in this case involves the consequences of that breach and Enodis' rights as a result thereof. Whether there is a single agreement, breached by both Hall and the debtor, or two agreements, one breached by Hall and one breached by the debtor, does not matter. The operative fact here is that the agreement has been breached because Enodis has not been reimbursed for the post-closing insurance costs due it.

ance coverage was extinguished when Hall and Consolidated breached their obligation to reimburse Enodis for the costs it incurred and, in order to mitigate its damages, Enodis would be entitled to attempt to cancel the insurance it had previously obtained. Consolidated's bankruptcy changed all of this. Because they provide coverage for the debtor, that insurance represents property of the bankruptcy estate, 11 U.S.C. § 541, and the automatic stay prevents Enodis from taking any action to exercise control over such property. *See,* 11 U.S.C. § 362(a)(3). Although styled as a request for declaratory relief, this adversary proceeding is, in effect, a request for relief from the automatic stay so that Enodis can be free to enforce its rights under non-bankruptcy law.

■ The Trustee, understandably, does not want Enodis to cancel whatever insurance coverage the estate may have and contends that its only remedy in this situation is to file a proof of claim for the unreimbursed expenses. This argument is based upon decisions arising out of insurance litigation where the estate failed to pay some type of retrospective premium to reimburse the insurance company for expenses it had incurred. *See, e.g., In re Texscan Corp.,* 976 F.2d 1269 (9th Cir. 1992); *In re Sudbury,* 153 B.R. 776 (Bankr.N.D.Ohio 1993); *Matter of Federal Press Co.,* 104 B.R. 56 (Bankr.N.D.Ind. 1989). *See also, In re Firearms Import and Export Corp.,* 131 B.R. 1009 (Bankr. S.D.Fla.1991). Under these decisions, the policies were not treated as executory contracts, *see, Texscan,* 976 F.2d at 1273; *Sudbury,* 153 B.R. at 781; *Federal Press,* 104 B.R. at 66, and the rights of the insurance companies were limited to the opportunity to file a proof of claim for any unpaid amounts due it. *See, Firearms Import,* 131 B.R. at 1014. The Trustee contends Enodis is no different. Admit-

tedly, the decisions the Trustee relies upon for his argument do stand for the proposition he espouses. Nonetheless, the facts of those cases are meaningfully different from the facts presented in this case.

In the litigation involving insurance companies, the policies in question contained a provision to the effect that the insolvency of the insured would not relieve the insurance company of its obligations under the policy. Those decisions seem to have been greatly influenced by this particular provision, especially in view of the fact that the primary reason for the default which led to the litigation was the debtor's insolvency. *See, Sudbury,* 153 B.R. at 778; *Federal Press,* 104 B.R. at 63. *See also, Texscan,* 976 F.2d at 1273. Consequently, in many respects, the courts simply recognized and enforced the provisions of the agreement between the parties. Here the court is faced with quite a different scenario. Although the court recognizes that the various insurance policies covering the debtor provide that coverage may not be cancelled due to insolvency, (Joint Pre–Trial Order ¶ 15(q)), this adversary proceeding does not arise out of those insurance contracts. Instead, it is based upon the agreement between Enodis, Hall and the debtor and that agreement does not contain any provision to the effect that insolvency will not relieve Enodis of its obligations under the contract. In the absence of such a provision, there is no basis for concluding that Enodis' obligations under the agreement should continue unabated, notwithstanding the default.

■ The court is not aware of any reported decisions confronting the unique arrangement now before it. Nonetheless, the court feels that appropriate guidance for its decision can be found by characterizing this dispute as what it really is—a request for relief from the automatic stay

so that a creditor may proceed to enforce its rights under non-bankruptcy law. Pursuant to § 362(d), the court may terminate or modify the automatic stay "for cause, including the lack of adequate protection of an interest in property." 11 U.S.C. § 362(d)(1). Under this provision, where a secured creditor is faced with the continuing loss to or depreciation of its collateral, in the absence of some type of adequate protection that would compensate it for that loss, the court should terminate the automatic stay so that the creditor may exercise it non-bankruptcy right to proceed against its security, in order to staunch the flow of blood and minimize its losses. *See, e.g., United Sav. Assoc. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 370, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988); *In re Deico Elec., Inc.*, 139 B.R. 945, 947 (9th Cir. BAP 1992); *In re Dupell*, 235 B.R. 783, 788 (Bankr.E.D.Pa.1999); *In re Miller*, 13 B.R. 110, 117–18 (Bankr.S.D.Ind.1981).

■ Although § 362(d)(1) more commonly comes into play when the court is called upon to consider the rights of secured creditors, it is not limited to those situations. *See, In re Hinders*, 22 B.R. 810, 811–12 (Bankr.S.D.Ohio 1982). In many respects, however, Enodis' position is little different from that of a secured creditor facing the continued decline in the value of its collateral. Admittedly, it has no collateral (depreciating or otherwise) that it can resort to in order to minimize its losses. It is, however, faced with the prospect of a continually increasing unsecured claim, through the unreimbursed expenses that it has and will continue to incur, and the opportunity under non-bankruptcy law to minimize its losses by attempting to cancel the insurance con-

tracts generating those expenses. Indeed, in many ways, Enodis' exposure is actually greater than that of the secured creditor whose collateral is depreciating. While the secured creditor's potential loss in such a situation is fixed by the value of the collateral, Enodis faces an ever increasing obligation, seemingly without limit. Pursuant to § 362(d)(1), it seems Enodis should be permitted to exercise its opportunity to cut those continuing losses.

The court must acknowledge that it is intrigued by the possibility that insurance could be cancelled years after the term of that coverage has expired and after claims have been made against it. Nonetheless, in order to obtain relief from the stay, Enodis was not required to prove that it can actually do so. It is sufficient for it to prove that it has a "colorable claim" concerning the opportunity for cancellation and the policies in question do provide that Welbilt may cancel them. *Cf., Matter of Vitreous Steel Products, Co.*, 911 F.2d 1223, 1234 (7th Cir.1990)(questions concerning the validity of liens are not at issue under § 362(d), only whether there is a colorable claim to a lien). Accordingly, the court does not hold that Plaintiff may actually succeed in canceling the policies—that will be a matter between it and the insurance carriers. The court holds only that it has established a colorable claim that it may do so.[3]

■ A second provision of the Bankruptcy Code also seems to speak to the matter before the court. Because it is required to pay post-closing insurance expenses which are supposed to be reimbursed, Enodis' position is, in many ways, similar to that of a creditor that has extended a pre-petition line of credit to the

---

**3.** In a similar fashion, in view of the policies' provisions that insolvency will not relieve the various insurers of their obligations, the court expresses no opinion concerning the effect any cancellation might have upon their obligations under the policies.

**234**

debtor. Section 365(c)(2) provides that such an agreement, even if executory, may not be assumed in bankruptcy. 11 U.S.C. § 365(c)(2). This provision was designed "to protect a party to a contract from being forced to extend cash or a line of credit to one who is a debtor under the Bankruptcy Code." *See, In re Cannonsburg Envtl. Assocs., Ltd.,* 72 F.3d 1260, 1266 (6th Cir.1996) (quoting 1 Collier Bankruptcy Manual ¶ 365.02[2], at 14–15 (3d ed.1995)). Thus, the trustee "may not force a creditor into the untenable position of having to extend straight cash to an insolvent debtor." *Id.* Although the court recognizes that § 365(c)(2) does not directly address the issue before it, the policy it represents—that, after bankruptcy, a creditor should not be required to continue to lend money to a debtor—does offer some illumination. Because it must pay the debtor's post-closing insurance costs, which are then supposed to be reimbursed, Enodis essentially finds itself in the position of being forced to continue to loan money to the debtor after bankruptcy. Section 365(c)(2) indicates that Congress was not willing to permit this.

Read together, both § 362(d)(1) and § 365(c)(2) reveal an underlying policy that a creditor's potential losses should not increase during a bankruptcy proceeding, but should, instead be fixed as of the date of the petition. Thus, a creditor cannot be forced to loan a debtor additional money, thereby increasing its exposure, and, if a creditor's collateral declines in value, thereby jeopardizing its recovery, it should be freed from the automatic stay so that it can proceed against its security. In this case, Enodis' potential losses as a result of the debtor's bankruptcy have not been fixed but are, instead, increasing because of the unreimbursed post-closing insurance expenses it is required to pay. This is contrary to the policy reflected in sections 362(d)(1) and 365(c)(2). Furthermore, En-odis also has the opportunity to minimize these continuing losses by exercising its opportunity to cancel the insurance policies generating them. It should be permitted to try to do so.

■ Having determined that Enodis is entitled to relief in this proceeding, the court must also consider the scope of the relief Enodis should receive. Both parties have argued the issue as an all or nothing proposition, but the court does not believe that this must necessarily be so. While the relief the court grants should correct the problem that leads it to conclude relief is appropriate, the nature of the problem should guide the court in fashioning the appropriate relief. In other words, the court should not resort to using a meat axe when a scalpel is required. Although somewhat trite, this adage is appropriate here because the stipulated facts seem to indicate that one insurance policy in particular—policy No. 1523–00–086090 issued by Employers Insurance of Wausau—is the source of Enodis' increasing exposure. (Joint Pre–Trial Order ¶¶ 15(j—l), (y—dd).) No other policy is so specifically identified as the source of continuing unreimbursed post-closing insurance costs. If this is the source of Enodis' problem, it should also be the object of Enodis' relief.

■ At least to some extent, both relief from the automatic stay and declaratory relief are matters committed to the court's discretion. *See, Matter of Holtkamp,* 669 F.2d 505, 507 (7th Cir.1982)(whether cause exists to terminate the stay is discretionary); *Wilton v. Seven Falls Co.,* 515 U.S. 277, 282, 115 S.Ct. 2137, 2140, 132 L.Ed.2d 214 (1995)(declaratory relief is discretionary). Although Enodis wants the court's permission to cancel all of the debtor's liability insurance, there is no need to allow it to proceed with such wholesale destruction.

To authorize such sweeping relief when the source of the problem is much more circumscribed would be inappropriate. There is no reason to deprive the estate of whatever benefit other insurance policies may provide when those other policies are not the cause of Enodis' increasing exposure. *See, C & S Grain,* 47 F.3d at 238 (court should base its decision concerning whether cause exists to lift the stay on the hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code).

## CONCLUSION

Enodis is entitled to relief from the automatic stay so that it can proceed to attempt to cancel the debtor's coverage under policy No. 1523–00–086090 issued by Employers Insurance of Wausau.

Judgment will be entered accordingly.